**Guttilla & Murphy, PC**
**Ryan W. Anderson (No. 020974)**
**4150 West Northern Ave.**
**Phoenix, Arizona 85051**
**(623) 937-2795**
**randerson@gamlaw.com**
Attorneys for the Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lawrence J. Warfield, Receiver for CP Direct, Inc. | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) ) |
| Marc A. Gardner and North American BanCard, Inc., a Michigan Corporation, | ) ) ) ) |
| Defendants. | ) ) ) |

Cause No. CV 04-0974-PHX-JAT

SECOND AMENDED COMPLAINT

Plaintiff LAWRENCE J. WARFIELD, the court appointed Receiver for C.P Direct Inc, herein after ("Plaintiff"), for its claims against the Defendants alleges as follows:

ALLEGATIONS COMMON TO ALL COUNTS

INTRODUCTION

1.      The Plaintiff is the Court Appointed Receiver in Civil Action Number CV 2002-011275 entitled *State of Arizona vs. CP Direct, Inc. et al.* CP Direct ("CP") was a Nevada corporation, doing business in the State of Arizona. CP marketed and sold various

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

nutritional supplements including a penis enlargement pill known as "Longitude", and a breast enlargement pill called "Full & Firm. CP marketed and sold other nutritional supplements which purportedly increased a person's height, caused a person to lose weight and a pill which would improve a person's golf game. CP obtained seventy-seven million six hundred twenty-seven thousand, six hundred fifteen dollars and 99 cents ($77,627.615.99) from the sale of these nutritional supplements.

2.      Vincent Passafiume ("Passafiume") was an executive of CP from inception to the time it was placed into receivership.  Michael Consoli ("Consoli") was the President of CP from inception to the time it was placed into receivership.

3.      CP was a legitimate Nevada Corporation with its principal place of business in Scottsdale, Arizona.  The separate status of CP was relied upon by customers, vendors and others.  Consoli or Passafiume wrongfully and without proper authorization took moneys that belonged to CP to transfer to Gardner, or NAB, including $700,000, as more fully described in paragraphs 51, 52, and 53 *infra*, as well as all other moneys paid in excess of 2.68% of CP credit card sales.

4.      This action seeks civil remedies against the North American BanCard ("NAB") and Defendants Marc A. Gardner ("Gardner") pursuant to A.R.S. § 13-2314.04, including but not limited to damages, attorneys fees and costs, as a person who has sustained reasonably foreseeable injury to its business or property by a pattern of unlawful activity perpetrated by the Defendants or by the Defendants' violation of A.R.S. § 13-2312 (illegal control or conduct of an enterprise). The Plaintiff also seeks recovery of CP funds based on the

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1  Defendants' unlawful conversion and under equitable and legal claims as discussed more

2  fully, *infra*.

3  <u>JURISDICTION AND VENUE</u>

4      5.    This Court has original jurisdiction over this matter pursuant to Arizona

5  Constitution Article 6 § 14 and A.R.S. § 12-401.

6      6.    This suit stems from acts by the Defendants which caused various events to

7  occur in Maricopa County, Arizona.  Defendants did business in and caused material events

8  to occur in Maricopa County, Arizona.   All acts alleged in this complaint either took place in

9  the State of Arizona or had an effect upon residents of the State of Arizona.

10      7.    At all material times, CP's principal place of business was in the State of

11  Arizona; the principal place of business of CP "acting as" NSI was in the State of Arizona; all

12  sales of CP and CP "acting as" NSI products were sold in or from the State of Arizona; and

13  all products were shipped from Arizona.

14      8.    In December, 2000, Defendants sent to CP, in Arizona, a Merchant Application

15  for completion and signature whereby CP agreed to pay 2.68% of its credit card sales to

16  Defendant NAB in exchange for Defendant's facilitation of credit card processing services to

17  CP.  This document was signed by Consoli on December 11, 2000 and returned to

18  Defendants.

19      9.    In January, 2002, Defendants sent to CP, in Arizona, a Merchant Application

20  for completion and signature by CP "acting as" NSI whereby CP agreed to pay 3.9% of all

21  CP "acting as" NSI credit card sales to Defendant NAB in exchange for Defendant's

1   facilitation of credit card processing services to CP.  This document was signed in Arizona by

2   Consoli using an alias "Randy Joseph," on January 17, 2002, and returned to Defendants.

3         10.    After sales were being processed, on or about March 14, 2002, Defendant

4   Gardner sent an email to the attorney for CP, in New Jersey, along with a copy to Consoli, in

5   Arizona, agreeing that effective March 2002, Defendant NAB would receive 2.85% of all CP

6   "acting as" NSI internet credit card sales in exchange for Defendant's facilitation of credit

7   card processing services to CP, "acting as" NSI, instead of the previous amount of 3.9%.  In

8   addition, Gardner stated, in the email, that Defendants were to be paid $250,000 per month

9   for "consulting services" plus additional bonuses if credit card sales exceeded $8,000,000 per

10  month.

11        11.    Defendant NAB received a percentage of all sales made by CP or CP "acting

12  as" NSI, in or from Arizona, where the purchaser made payment by credit card.  These sales

13  totaled approximately sixty-six million two hundred twenty thousand dollars ($66,220,000).

14        12.    Pursuant to the demands of Defendants, on or about March 14, 2002, a check

15  was drawn on a Wells Fargo of Arizona bank account of CP for the sum of two hundred and

16  fifty thousand dollars ($250,000) and sent by Consoli from Arizona to Defendant Marc

17  Gardner which was then deposited into Gardner's personal investment account at Smith

18  Barney.

19        13.    Pursuant to the demands of Defendants, on March 25, 2002, money in the sum

20  of two hundred and fifty thousand dollar ($250,000) was sent from a Wells Fargo Bank of

21

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1   Arizona account of CP for wire transfer to the personal Smith Barney investment account of

2   Defendant Marc Gardner.

3        14.     Pursuant to the demands of Defendants, on April 25, 2002, money in the sum of

4   two hundred thousand dollars ($200,000) was sent from a Wells Fargo Bank of Arizona

5   account of CP for wire transfer to the personal Smith Barney investment account of

6   Defendant Marc Gardner.

7        15.     Jurisdiction is proper in this Court pursuant to the *Amended Order Appointing*

8   *Receiver/Conservator* ("Receivership Order") which appointed Lawrence J. Warfield as

9   Receiver for CP and all of the "Receivership Assets" described in that Order.  The

10  Receivership Order directed the Receiver to collect, receive and take exclusive custody and

11  control and possession of the Receivership Assets.  The Receivership Order specifically

12  provides in ¶ 11 as follows:

13            IT IS FURTHER ORDERED that the Receiver is directed
             and authorized to accomplish the following:

14

15                              •   •   •

16            Institute, compromise, adjust, appear in, intervene in, or
             become party to such actions or proceedings in state, federal or
             foreign courts that the Receiver deems necessary and advisable to
17           preserve or recover the assets of the Receivership Defendants, or
             that the Receiver deems necessary and advisable to carry out the
18           Receiver's mandate under this Order;

19        16.     Pursuant to Order Re: Petition No. 46 entered on April 2, 2004, Judge Katz of

20  the Maricopa County Superior Court authorized the Plaintiff to file this Complaint.

21

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

17.     The venue for this lawsuit was originally proper in Maricopa County Superior Court pursuant to A.R.S. § 12-401. However, the Defendants removed this case to the United States District Court for this District of Arizona. Venue in the Federal District Court is automatically satisfied when an action has been removed from State Court.

## THE PARTIES

## PLAINTIFF

18.     Lawrence J. Warfield is the Court Appointed Receiver in an action pending before the Arizona Superior Court for Maricopa County, Cause No. CV 2002-011275, entitled *State of Arizona vs. CP Direct, Inc. et al.*

## DEFENDANTS

19.     Gardner is, upon information and belief, a resident of the State of Michigan and resides at 1421 Rembrook, Bloomfield, Michigan 48304.  Gardner is the President of NAB. As President, Gardner controls the operations of NAB.

20.     NAB is a Michigan corporation located at 3001 West Big Beaver Road, Suite 608, Troy, Michigan 48084.  NAB is a company which provides retailers with the ability to process credit card sales.  NAB facilitated credit card transactions for CP in connection with the sale of various "nutritional" supplements.

## FACTUAL BACKGROUND

21.     The Plaintiff brings this suit to recover, at least, seven hundred thousand dollars ($700,000.00) improperly transferred from CP to Gardner and NAB in the form of payments

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1   in excess of the normal fees for processing credit card transactions.  Defendants required the

2   payment of these additional fees in order to enable CP to continue its business operations.

3       22.     The Plaintiff additionally brings this suit to recover all of NAB's profits, fees

4   and income derived from CP retail sales as proceeds of the racketeering enterprise of the

5   Defendants.

6       23.     The Plaintiff also seeks punitive or treble damages, and the attorney fees and

7   costs related to this action.

8       24.     Consoli and Passafiume controlled and operated CP.  CP marketed and sold

9   various "nutritional" supplements including a penis enlargement pill ("Longitude"), a breast

10  enlargement pill ("Full & Firm"), a pill which purportedly enabled people to grow taller

11  ("Stature"), a pill that supposedly encouraged weight loss ("Fatblok"), and a pill designed to

12  improve a person's golf game ("Longjack"). CP grossed seventy-seven million six hundred

13  twenty-seven thousand, six hundred fifteen dollars and 99 cents ($77,627,615.99) from the

14  sale of these "nutritional" supplements.  CP marketed Longitude and the other "nutritional"

15  supplements through magazine, newspaper, and television ads throughout the United States

16  and Canada.

17      25.     As Longitude's sales volume increased NAB and Gardner contracted directly

18  with CP to process its credit card transactions.  CP depended on credit card transactions to

19  sell its products, approximately 86 % of CP sales were by credit card.

20      26.     NAB processes credit cards for small business retailers through its contractual

21  relationship with Global Payment Services (GPS) which accepts customers of NAB and

1    enables retailers like CP to process its credit cards sales.  NAB served as the agent of CP to

2    GPS.  Although GPS actually processed CP credit card sales, NAB was paid a percentage of

3    CP's credit card sales.  Since CP could not process the credit card transactions directly it

4    required the services of NAB and GPS to conduct its business.

5           27.    On December 15, 2000, Consoli, as an officer of CP, submitted a Merchant

6    Application to NAB to process CP credit card sales.  According to the Merchant Application,

7    NAB would receive 2.68 % of each credit card sale processed by GPS through NAB.

8    Furthermore, the Merchant Application contained various contract provisions which outlined

9    fees and costs which CP would incur for the use of NAB's services.

10          28.    Under its agreement with GPS, NAB, as CP's merchant processor, was required

11   to supervise the credit card processing of CP.  One of the benchmarks which NAB must

12   strictly monitor when supervising an account is the "chargeback" ratio.  The chargeback ratio

13   is a calculation which identifies the percentage of retail customers who request their credit

14   card company (Visa, MasterCard, or Discover) to refund money paid to a merchant.  Upon

15   information and belief, credit card processors, like GPS, terminate contractual arrangements

16   when chargebacks in excess of one percent (1 %) of total sales occur. If a merchant, such as

17   CP, exceeds the 1% chargeback ratio it can be placed on a "watch list".

18          29.    Upon information and belief, the "watch list" includes retail merchants who are

19   close to exceeding the one percent (1 %) chargeback rate or have exceeded that rate for a

20   short period of time.  A retail merchant may be placed on this watch list for a month or more

21

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

8

1    if a retailer incurs chargebacks above one percent (1 %) of total sales. Within twelve months,

2    CP was placed on the "watch list" by GPS.

3         30.    On or about January, 2002, representatives of GPS informed NAB that CP had

4    exceeded the one percent (1%) chargeback ratio.

5         31.    On or about February, 2002, representatives of GPS informed NAB that it

6    would discontinue processing credit card transactions for CP because CP had violated the one

7    percent (1%) chargeback ratio for three consecutive months. This action by GPS would have

8    left CP without a credit card processor and NAB without one of its largest grossing accounts.

9         32.    A complete termination of the GPS agreement with CP would have two

10   significant consequences:  1) termination of CP's credit card sales, which represented most of

11   its business; and 2) substantial reduction of NAB's volume of sales.

12        33.    In an attempt to maintain its sales, CP attempted to contract with other credit

13   card processors. CP established accounts with SureFire Communications in Alberta Canada

14   and attempted to establish a credit card merchant services agreement with Bank of Omaha.

15   None of these efforts provided sufficient services to have enabled CP to continue its business

16   at its previous levels.

17                              COUNT ONE

18                     PATTERN OF UNLAWFUL ACTIVITY

19        34.    The Plaintiff realleges all of the facts set forth in the foregoing paragraphs.

20        35.    The pattern of unlawful activity involved two or more predicate offenses

21   committed within a five year period.  The predicate offenses are set forth in A.R.S. § 13-

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

9

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

2314.04 as defined in A.R.S. § 13-2301 involving the creation of a fraudulent business entity called Nutritional Supplements, Inc. ("NSI").   The predicate offenses include forgery, theft by extortion, and fraudulent schemes.

36.     At the Defendants' direction, CP devised NSI, which the Defendants informed CP could engage in credit card sales for CP and avoid all of the negative chargeback history of CP. The Defendants informed CP that by creating a new company and hiding the fact that CP controlled it would enable CP and NAB to continue business at previous sales levels.

37.     The Defendants directed Consoli to provide NAB with various documents purporting to show that NSI was unrelated to CP. The Defendants directed Consoli to create fraudulent documents to establish that NSI existed and was a going concern, including forged corporate charter, checks, a licensing agreement between CP and NSI purporting to grant to NSI a license to sell Longitude, and forged and fraudulently prepared state and federal tax returns for NSI.

38.     In fact, Consoli and Passifime controlled NSI since it is an alter-ego of CP and a fraudulent corporation never incorporated.  NSI's corporate charter was created by altering CP's corporate charter. The check accompanying the application purporting to be from NSI was in fact a CP check which was altered to make it appear to be a NSI check.  The check's routing numbers matched those for CP's existing bank accounts.  The address and phone numbers listed for NSI were identical to those of CP.  Neither Consoli nor Passafiume had authority to use CP funds for or on behalf of NSI or to form NSI for or on behalf of CP.

39.     Moreover, NSI completed a merchant application for the Defendants which contained fraudulent information. The Defendants informed Consoli that the fraudulent information was required in order for CP, as NSI, to obtain a credit card processing account with GPS.

40.     On or about February 1, 2002, CP, as NSI, submitted to Defendants its merchant account application which was accepted.  Gardner presented the application of CP, acting as NSI, to GPS without disclosing that NSI was a non-existent company.  Gardner also represented to GPS that NSI had a licensing agreement with CP that gave it the rights to sell CP's Longitude, a document which did not exist at this time.  Due to the Defendants' misrepresentations, GPS accepted CP, as NSI, as a client and began processing its credit card transactions in February, 2002.

41.     In March, 2002, the Defendants telephoned Jeff Koenig of the Law Firm of Porzio, Bromberg & Newman, P.C. ("Koenig") who served as the attorney for CP.  Gardner informed Koenig that GPS was going to audit NAB client files and Gardner was concerned about the potential audit of the CP and NSI files.  It was at this time that Gardner requested Koenig to draft a licensing agreement in which CP purportedly granted NSI a license to sell Longitude.  Gardner explained that the licensing agreement was necessary to cover up the actual relationship between CP and NSI.

42.     As a condition of processing CP, as NSI's, credit card purchases for Longitude, Gardner demanded a monthly "consulting fee" of up to two hundred and fifty thousand dollars ($250,000.00) per month, with additional bonuses.  Gardner, as President of NAB,

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

required these payments in order to continue processing credit card sales for CP, as NSI. This arrangement was memorialized in an email dated March 14, 2002.

43.    The bonus arrangement also provided that Defendants were to receive an additional fifty thousand ($50,000.00) for every one million dollars ($1,000,000.00) of CP, as NSI, sales exceeding eight million dollars ($8,000,000.00) per month.

44.    Gardner forced CP through Consoli to pay these "consulting fees" to continue processing CP, as NSI's, credit card transactions.

45.    On March 22, 2002, Koenig delivered to Defendants by Federal Express, the purported licensing agreement between CP and NSI.

46.    On March 12, 2002, Consoli sent two hundred and fifty thousand dollars ($250,000.00) of CP funds in the form of CP check No. 1021 payable to Gardner. This CP check was deposited on March 28, 2002 into Gardner's personal investment account at Smith Barney.

47.    On March 25, 2002, Consoli sent two hundred and fifty thousand dollars ($250,000.00) of CP funds in the form of a wire transfer payable to the personal Smith Barney account of Gardner.

48.    On April 25, 2002, Consoli sent two hundred thousand dollars ($200,000.00) of CP funds in the form of a wire transfer payable to the personal Smith Barney account of Gardner.

49.    CP paid up to seven hundred thousand dollars ($700,000) from the assets of CP to Defendants in order to insure CP could continue processing its credit card sales.

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1    50.    Defendants provided no consulting services to NSI as CP in consideration of

2  the seven hundred thousand dollars ($700,000) delivered to the personal Smith Barney

3  account of Marc Gardner.

4    51.    The payments ended on or shortly before the filing of the action by the State of

5  Arizona in the matter of *State of Arizona vs. CP Direct, Inc. et al.*

6    52.    The Defendants have engaged in acts, including a scheme or artifice to defraud,

7  theft by extortion, and forgery, from on or about January 1, 2002 to May 22, 2002, that were

8  continuous and exhibited the threat of being continuous.  CP was injured by the unlawful

9  activity alleged above in the amount of the $700,000.00 in "consulting fees" and the payment

10  to NAB of the more than 2.68% of all credit card processed.

11                                COUNT TWO

12        ILLEGALLY CONTROLLING OR CONDUCTING AN ENTERPRISE

13    53.    The Plaintiff realleges all of the facts set forth in the foregoing paragraphs.

14    54.    The Defendants illegally controlled an enterprise through a pattern of unlawful

15  activity or its proceeds, or conducted an enterprise as part of their employment or association

16  with the enterprise by conducting the enterprise's affairs through a pattern of unlawful

17  activity, in violation of A.R.S. § 13-2312.  The enterprises controlled or conducted by the

18  Defendants include NAB, which is controlled through it corporate structure as set forth in its

19  articles of incorporation, by-laws and laws of Michigan, and the Gardner/NAB enterprise.

20    55.    Gardner, as an individual and as President of NAB, created and operated the

21  Gardner/NAB enterprise which enabled him to receive the $700,000 from CP for his personal

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1   use while NAB, a legitimate corporation which has an existence separate from its

2   participation in the pattern of illegal activity, continued to process legitimate credit card sales

3   for other retailers.

4        56.   As NAB's President, Gardner directed the operations of Gardner/NAB

5   enterprise, which allowed NSI to process credit cards even though CP was banned from

6   processing credit card transactions. Apart from directing the legitimate operations of NAB,

7   Gardner exercised control over Gardner/NAB enterprise and made decisions for the

8   enterprise for the purpose of extracting $700,000 from CP for consulting fees for services

9   which were never provided by NAB or Gardner.

10        57.   Gardner, in his enterprise with NAB, made demand through NAB for $700,000

11   from CP for "consulting fees" for "consulting services" that were never provided by NAB or

12   Gardner.  Gardner then directed the payment of the $700,000 to his own personal Smith

13   Barney investment account.

14        58.   At all times material herein, the Defendants have been employed by or have

15   been associated with an enterprise including individuals, partnerships, corporations,

16   associations and other legal entities and/or a group of individuals associated in fact although

17   not a legal entity within the meaning of A.R.S. §  13-2301(D)(1) and (4). This enterprise

18   operated from on or about January 1, 2002 until May 22, 2002, when the Plaintiff was

19   appointed Receiver. All of the various associates of the racketeering enterprise, including the

20   Defendants, functioned as a continuing unit. Each of the Defendants and other associates of

21

14

1  the enterprise performed a role that perpetuated and furthered the enterprise and which

2  furthered the activities of the enterprise.

3      59.    The Defendants have aided and abetted the enterprise and the acts constituting

4  the pattern of activity and such aiding and abetting are predicate acts in and of themselves

5  within the scope of the pattern of unlawful activity.

6      60.    The Defendants through their membership in the enterprise and the pattern of

7  activity have unlawfully maintained their interest in or control of NAB and its assets.

8      61.    At all times material herein, each of the Defendants were engaged in a

9  relationship of mutual agency and with one another so that the act or omission of one of the

10  Defendants as a member of the enterprise can be imputed to be the act and/or omission of

11  each and every Defendant as a member of the enterprise.

12      62.    Upon information and belief, the pattern of unlawful activity of the Defendants

13  and the enterprise to which they belong permitted the Defendants to accept fraudulent

14  transfers from CP and permit the Defendants to make fraudulent transfers from NAB to or for

15  the benefit of the Defendants their affiliates, other members and associates of the enterprise.

16  CP was injured by the violations of A.R.S. § 13-2312 as alleged above in the amount of the

17  $700,000.00 in "consulting fees" and the payment to NAB of the more than 2.68% of all

18  credit card processed.

19  COUNT THREE

20  CONVERSION

21      63.    The Plaintiff realleges all of the facts set forth in the foregoing paragraphs.

15

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

64.     The Defendants have intentionally exercised control over Plaintiff's property of up to seven hundred thousand dollars ($700,000) that was obtained from Plaintiff as set forth in the foregoing allegations of this Complaint.   Such exercise of control has seriously interfered with the Plaintiff's use of such funds in connection with the receivership action.

65.     On or about June 3, 2002, Plaintiff demanded that the Defendants return said funds, which the Defendants have failed and refused to do.

66.     Plaintiff has been damaged by not having possession and use of such funds since on or about February 2002, and is entitled to the return of those funds, including interest thereon.

67.     Due to the Defendants' willful refusal to return said funds Plaintiff is also entitled to punitive damages.

<u>COUNT FOUR</u>

<u>UNJUST ENRICHMENT/CONSTRUCTIVE TRUST</u>

68.     The Plaintiff realleges all of the facts set forth in the foregoing paragraphs.

69.     By obtaining up to seven hundred thousand dollars ($700,000.00), and other moneys in excess of the 2.68% of CP's credit card sales, from Plaintiff as described in the foregoing paragraphs, Defendants were enriched.

70.     By paying up to seven hundred thousand dollars ($700,000.00), and other moneys in excess of the 2.68% of CP's credit card sales, to Defendants, Plaintiff suffered a financial loss.

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

71.     Defendants did not provide any legitimate services that justified the payment of up to seven hundred thousand dollars ($700,000.00), and other moneys in excess of the 2.68% of CP's credit card sales, to them from the assets of Plaintiff.

72.     Accordingly, the Defendants were unjustly enriched and should be ordered to restore the seven hundred thousand dollars ($700,000.00), plus all other proven damages, to the Plaintiff.

73.     Since the Defendants have been unjustly enriched, they are wrongfully holding the Plaintiff's property, and therefore hold said property as trustees for the Plaintiff.

## COUNT FIVE

## EQUITABLE RECSISSION

74.     The Plaintiff realleges all of the facts set forth in the foregoing paragraphs.

75.     Defendants' agreement with Consoli for the facilitation of credit card processing services to CP in exchange for the payment of $700,000 into the personal Smith Barney investment account of Defendant, Marc Gardner, in addition to the agreement for payment of more than 2.68% in credit card sales, was illegal or void against public policy.

76.     Accordingly, the contract must be rescinded by the Court and the Defendants jointly and severally should be ordered to return the $700,000 plus all other monies paid pursuant to the illegal, or void, agreement to the Receiver for CP Direct.

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

## COUNT SIX

## BREACH OF CONTRACT

77.     The Plaintiff realleges all of the facts set forth in the foregoing paragraphs.

78.     As an alternative claim to counts one through four *supra*, the Receiver claims that Defendants breached the agreement between Defendants and Consoli for the provision of legitimate "consulting services" fees (in excess of the percentage of CP product internet sales paid to Defendants).  No such legitimate "consulting" services were provided to Consoli or CP or CP "acting as" NSI despite payment of $700,000, or any other additional moneys, for such "consulting services".

79.     Accordingly, the Receiver should be awarded the sum of $700,000 plus any other sums paid for services not received.

## COUNT SEVEN

## BREACH OF CONTRACT

80.     The Plaintiff realleges all of the facts set forth in the foregoing paragraphs.

81.     On or about December 11, 2000, CP executed a contract for credit card processing with NAB (hereinafter "First Contract").  The First Contract called for NAB to receive 2.68% of each CP sale and a fee of .30 cents for each CP transaction.

82.     All fees generated by CP credit card processing were paid to NAB. NAB automatically debited the bank accounts of CP for payment of all fees associated with the credit card sales of CP products.

83.     Between January, 2001 and May, 2002, NAB charged CP for 303,916 transactions in excess of the actual transactions as detailed in the monthly billing statements of CP's credit card sales.  Furthermore, the transaction fees charged to CP during this time period fluctuated from $1.26 per transaction to .35 cents per transaction.  Despite the fluctuation, the actual transaction fee charged to CP was always charged (and paid) more than the contracted amount of .30 cents per transaction.  Accordingly, CP paid excess transaction fees of $122,229.10.

84.     Upon information and belief, address verification for Discover and American Express credit card charges did not exist between January 2001 and December 2001.  However, during this time period, NAB charged CP .05 cents for each bogus address verification of CP sales made by Discover and American Express cardholders.  A review of the monthly transaction statements for CP between January, 2001 and May, 2002 details CP was charged $4,481.30 in bogus Discovery and American Express address verifications.

85.     Between January 2002 and May, 2002, NAB began to charge CP a "retrieval fee".  This retrieval fee, not specifically detailed in the First Contract, consisted of a $7,545.00 fee for a single retrieval.  For the period of January, 2002 to May, 2002, CP was charged $42,285.00 for 2317 retrievals.  Accordingly, CP was charged $42,285.00 for retrivial fees outside the terms of the First Contract.

86.     Accordingly, the Receiver should be awarded the sum of $168,995.40 representing excess fees paid to NAB under the First Contract.

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

Gutilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

## COUNT EIGHT

## BREACH OF CONTRACT

87.     The Plaintiff realleges all of the facts set forth in the foregoing paragraphs.

88.     On or about January 17, 2002, CP, under the fictional name of "NSI", entered into a contract for credit card processing with NAB ("Second Contract").  The Second Contract called for NAB to receive 3.9% of each CP/NSI sale and .30 cents for each CP/NSI transaction.

89.     Between January, 2002 and April, 2002, NAB charged CP/NSI for 154,517 transactions in excess of the actual transactions detailed in the monthly statements of CP/NSI credit card processing.  Furthermore, the transaction fee charged to CP/NSI between January, 2002 and April, 2002, was .35 cents per transaction.

90.     The fees generated by CP/NSI credit card processing were paid to NAB by NAB directly debiting from the bank accounts of CP/NSI.  Accordingly, CP/NSI paid $54,080.95 in excess transaction fees.

91.     Accordingly, the Receiver should be awarded the sum of $54,080.95 plus any other sums paid in violation of the credit card processing contract between CP/NSI and NAB.

WHEREFORE, Plaintiff, Lawrence J. Warfield, Receiver for CP Direct, Inc., requests that the Court:

1.     Enter judgment against Defendants in the amount of seven hundred thousand dollars ($700,000) as restitution, plus any other proven damages, plus interest in the rate of

Guttilla & Murphy, PC
4150 West Northern Ave
Phoenix, Arizona 85051
(623) 937-2795

1  ten percent (10%) per annum from May 22, 2002 until paid, plus reasonable attorney's fees,

2  pursuant to A.R.S. §12-341.01 and A.R.S. § 13-2314.04, plus costs;

3      2.      In the alternative, enter judgment against Defendants in the amount of two

4  million one hundred thousand dollars ($2,100,000.00) as treble damages, pursuant to A.R.S. §

5  13-2314.04, plus interest from the date of judgment, and reasonable attorney's fees, pursuant

6  to A.R.S. § 13-2314.04 and A.R.S. §12-341.01;

7      3.      Enter judgment against the Defendants in the amount of $223,076.35 of

8  restitution, plus any other damages, plus interest at the rate of 10 percent per annum from

9  January, 2001 until paid, plus reasonable attorneys fees pursuant to A.R.S. § 12-341.01;

10

11      4.      Enter judgment against the Defendants for punitive damages as may be

12  appropriate; and,

13      5.      Any other relief that may be appropriate in the premises.

14      Respectfully submitted this 15th day of May, 2006.

15                          GUTTILLA & MURPHY, PC

16

17                          s/Ryan W. Anderson
                            Ryan W. Anderson
18                          Attorneys for the Plaintiff

19  0780-023 (32426)

20

21

                            21

STATE OF ARIZONA )
                 )
County of Maricopa )

V E R I F I C A T I O N

I, Lawrence J. Warfield, the court-appointed Receiver for C.P. Direct, Inc. CP Direct, CP Nutritionals, CP Wholesale Direct, MAC Investments, Opulent Property Investments, Inc., VJP Investments, and all of the seized assets owned or controlled by Vincent Passafiume, Michael Consoli, and Geraldine Consoli, upon my oath do hereby declare that I have read the foregoing Second Amended Complaint, and know the contents thereof; that the matters and things contained therein are true in substance and fact, to the best of my information, knowledge and belief, except as to those matters and things alleged on information and belief, and as to those matters, I believe them to be true and correct under the premises.

DATED this _____9th_____ day of February, 2006.

_____
Lawrence J. Warfield

SUBSCRIBED AND SWORN to before this 9th day of February, 2006, by Lawrence J. Warfield.

_____
Notary Public

Gutilla & Murphy, PC
4150 West Northern Ave.
Phoenix, Arizona 85051
(623) 937-2795