**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lawrence J. Warfield, Receiver for CP Direct, Inc., <br><br>           Plaintiff, <br><br>vs. <br><br>Marc A. Gardner; North American Bancard, Inc., a Michigan corporation, <br><br>           Defendant. | No. CV 04-0974-PHX-JAT <br><br> **ORDER** |

Pending before the Court is Defendants' Motion to Stay Proceedings (Doc. #90). The Court now rules on the Motion.

**I.    BACKGROUND**

In September, 2002, the State of Arizona filed a complaint against CP Direct, Inc. ("CP") and its owners, Michael Consoli and Vincent Passafiume, alleging violations of the Arizona Racketeering Act. Plaintiff is the Court-appointed Receiver for the "Receivership Defendants" in that matter, a group that includes CP and its owners. While in existence, CP was a Nevada corporation operating in Arizona. North American Bancard, Inc. ("Defendant NAB") is a Michigan corporation. Marc A. Garder ("Defendant Gardner") is NAB's president and a Michigan resident.

CP formerly marketed and sold nutritional supplements, including a penis enlargement pill known as "Longitude," with sales totaling $77,627,615.99. Approximately 86% of CP's

total sales were comprised of credit card transactions. Because CP could not process its credit card transactions directly, it needed the services of an intermediary agent. Toward this end, in December, 2000, CP contracted with Defendant NAB to process its credit card transactions through Global Payment Services ("GPS"). In return, CP agreed to pay Defendant NAB 2.68% of each credit card sale it processed through GPS, as well as various other fees and costs for Defendant NAB's services.

Pursuant to its agreement with GPS, Defendant NAB was required to supervise CP's credit card processing, including the calculation of CP's chargeback ratio. This calculation represented the percentage of CP's customers who requested their credit card companies to refund money paid to CP.[1] Within a year after CP contracted with Defendant NAB, GPS placed CP on its watchlist. Subsequently, in February, 2002, GPS discontinued processing CP's credit card transactions because CP had exceeded the 1% chargeback ratio for three consecutive months. CP thereafter contracted with alternative credit card processors; however, it was unable to obtain services that enabled it to continue business at its previous levels.

Plaintiff alleges that around this time, Defendants advised CP to create a new company and to hide the fact that it controlled the new company. Defendants informed CP that if it formed a new company, it could avoid its negative chargeback history and resume processing its transactions through GPS. Toward this end, and at the Defendants' direction, CP devised a fictitious entity called Nutritional Supplements, Inc. ("NSI"). Defendants also directed Consoli to provide them with various documents purporting to show that NSI was unrelated to CP. Specifically, Defendants directed Consoli to create fraudulent documents to establish that NSI existed. These documents included a forged corporate charter, checks, and forged and fraudulently prepared state and federal tax returns for NSI. Additionally, CP

---

[1] If a merchant's chargeback ratio exceeds 1% of its total sales, credit card processors, like GPS, place the merchant on a watchlist. Credit card processors may eventually discontinue processing the merchant's credit card transactions if the chargeback ratio remains at that level for a period of time.

- 2 -

submitted to Defendants a merchant account application in the name of NSI, which contained fraudulent information in order for CP, as NSI, to obtain a credit card processing account with GPS. Defendant Gardner thereafter presented NSI's application to GPS without disclosing that NSI was a non-existent company. Defendant Gardner also represented to GPS that NSI had a licensing agreement with CP that gave NSI the right to sell Longitude; however, this licensing agreement did not exist at the time. Based on Defendants' representations, GPS accepted NSI as a client and began processing its credit card transactions in February, 2002. The following month, Defendants informed CP's attorney that GPS was going to audit Defendant NAB's client files. Defendants asked CP's attorney to draft a licensing agreement granting NSI a license to sell Longitude in order to cover up the actual relationship between CP and NSI.

As a condition of processing CP's (as NSI) credit card purchases for Longitude, Defendant Gardner demanded that CP pay a monthly consulting fee of up to $250,000, plus additional bonuses. The bonus arrangement provided that Defendant Gardner would receive an additional $50,000 for every million dollars of sales over $8 million per month. In order to continue processing its credit card transactions through GPS, CP paid Defendant Gardner $700,000 from its funds in three installments, even though Defendant Gardner provided no consulting services. CP ceased making payments when the State of Arizona filed the receivership action.

On May 12, 2004, Plaintiff filed the present action, asserting three claims against Defendants for: (1) violations under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) conversion; and (3) unjust enrichment. On August 8, 2005, the Court entered a scheduling order allowing the parties approximately one year to complete discovery and file dispositive motions. On April 3, 2006, the parties filed a motion to stay the litigation because they had reached a settlement. The Court denied this Motion on the grounds that this Court does not stay or delay litigation based on contingent settlements. Additionally, the Court confirmed the deadlines in the prior scheduling order.

1      On April 19, 2006, Defendants were indicted.  Almost one month later, on May 15, 2006, Defendants moved the Court to "extend all deadlines ninety days, without prejudice to file a subsequent motion to stay."  Because this Court had already set the deadlines and confirmed them, and because the Court did not find that Defendants showed cause for an extension, on May 16, 2006, the Court denied the request to extend the deadlines.  On June 19, 2006, a stipulation to extend the discovery and dispositive motion deadlines was filed. Again, because this Court set the discovery and dispositive motion deadlines, and because the Court had already twice confirmed those deadlines, the Court again denied the stipulated request for an extension.  Defendants then filed an emergency motion to stay district court proceedings with the Ninth Circuit Court of Appeals.  The Court of Appeals denied Defendants' Motion pending presentation of the Motion to this Court..

On July 11, 2006, Defendants filed the present Motion to Stay Proceedings with this Court. On July 12, 2006, Defendant Gardner's deposition took place. Defendant Gardner's counsel terminated the deposition, however, immediately after Defendant Gardner was sworn and stated his name.

## II.   LEGAL ANALYSIS AND CONCLUSION

### A.   MOTION TO STAY PROCEEDINGS

The Constitution does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings. *Federal Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 902 (9th Cir. 1989).  Thus, it is permissible to conduct a civil proceeding at the same time as a related criminal proceeding, even if that necessitates the invocation of the Fifth Amendment privilege.  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).  It is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding. *Id.*  "The decision to stay civil proceedings in the face of a parallel criminal proceeding should be made 'in light of the particular circumstances and competing interests involved in the case.'"  *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1994) (quoting *Molinaro*, 889 F.2d at 902).  The Court should generally consider the following factors when determining whether to stay a civil proceeding: (1) the

1  interest of Plaintiff in proceeding expeditiously with this litigation or any particular aspect
2  of it, and the potential prejudice to Plaintiff if a stay is granted; (2) the convenience of the
3  Court in the management of its cases and the efficient use of judicial resources; (3) the
4  interests of persons not parties to the civil litigation; (4) the interest of the public in the
5  pending civil and criminal litigation; and (5) the burden that any particular aspect of the
6  proceedings may impose on Defendants. *Molinaro*, 889 F.2d at 903.

7  First, the Court considers Plaintiff's interest in proceeding expeditiously with this
8  litigation. The present action has already been pending for over two years in this Court.
9  Defendants urge the Court to grant the Motion to Stay Proceedings pending the resolution
10 of the criminal proceedings; however, Defendants have not estimated how much time this
11 would involve. A date for the criminal trial has yet to be set; thus, an indefinite delay of the
12 civil proceedings would result. Additionally, witnesses' memories can fade over the course
13 of the delay, and witnesses might not be available following the termination of the criminal
14 proceedings. *Southwest Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 809
15 (N.D. Cal. 1989). Therefore, because a stay of the civil proceedings would indefinitely delay
16 Plaintiff's case and possibly cause prejudice to Plaintiff, this factor weighs in favor of
17 denying Defendants' Motion to Stay Proceedings.

18 Second, the Court considers its interest in clearing its docket and the efficient use of
19 its resources. The Ninth Circuit Court of Appeals has recognized that duplicative judicial
20 effort may result when criminal and civil proceedings advance in parallel. *See Chronicle*
21 *Publ. Co. v. NBC*, 294 F.2d 744, 747-48 (9th Cir. 1961). By proceeding with the criminal
22 prosecution first, courts make efficient use of judicial time by insuring that common issues
23 of fact will be resolved. *Id.* at 748. Thus, the advancement of the criminal proceeding prior
24 to the civil proceeding can substantially reduce a court's workload.

25 While in many cases a court's workload can be reduced by staying the civil case while
26 the criminal case proceeds, a stay in this case would not reduce the Court's workload because
27 the case has been pending for over two years. The Court has already invested a substantial
28 amount of time and effort into this case. Specifically, after removing the case from state

1 court, Defendants filed three motions to dismiss (Docs. ## 6, 7, and 8). Once Defendants
2 received a ruling from the Court on these motion (after oral argument and by a written order
3 totaling 27 pages), Defendants filed three more motions to dismiss (Docs. ## 31, 32, and 33).
4 After oral argument and receiving a written order totaling 18 pages, Defendants finally
5 answered on June 3, 2005 (over one year after they removed the case from state court).

6 In addition, the Court has set both the discovery and dispositive motion deadlines, and
7 the discovery deadline has now passed. Also, the Court has repeatedly issued orders
8 regarding various extensions that parties have filed. Furthermore, the Court would create
9 more work for itself by issuing a stay because it would have to re-open discovery and change
10 the discovery and dispositive motion deadlines. The Court should not be forced to create
11 more work for itself, especially considering that the parties' own actions have created the
12 present dispute before the Court. Specifically, the parties spent the year this Court allocated
13 for discovery in settlement negotiations. Neither party proceeded with discovery due to the
14 settlement negotiations. Thus, the parties, not the Court, created their deadline dilemmas by
15 choosing not to proceed with discovery as required by the Rule 16 scheduling order.

16 Not only would a stay result in the wasting of scarce judicial resources, but a stay
17 would also disrupt the Court's calendar by indefinitely postponing trial as Defendants'
18 criminal proceedings advance through the State criminal justice system. Thus, this factor
19 weighs in favor of denying Defendants' Motion to Stay Proceedings.

20 Third, the Court considers the interests of any persons not parties to the civil litigation.
21 Defendants argue that there are no third party interests in this case, but the Court disagrees.
22 CP's creditors have an interest in the expeditious disbursement of funds to which they are
23 entitled. Because the issuance of a stay would indefinitely delay the disbursement of any
24 acquired funds to the creditors, this factor weighs in favor of denying Defendants' Motion
25 to Stay Proceedings.

26 Fourth, the Court considers the interests of the public in the pending civil and criminal
27 litigation. The public has an interest in the effective prosecution of individuals and entities
28 who engage in racketeering activity to operate or gain control of business enterprises. The

public interest would be frustrated by any delay caused by the issuance of a stay. Thus, this factor weighs in favor of denying Defendants' Motion to Stay Proceedings.

Finally, the Court considers the burden imposed on Defendants if the Motion to Stay Proceedings is not granted. Defendants argue that if their Motion is denied, they will be subject to a substantial burden because their Fifth Amendment privilege against self-incrimination will be undermined. Although the Court agrees that a burden will be placed on Defendants if a stay is not granted, it finds that this burden does not create a sufficient basis for a stay. As stated by the district court in *IBM Corp. v. Brown*:

> [T]he contention that being forced to choose between the compulsion to testify in a civil suit in order to avoid an adverse result on the merits undermines the right to remain silent in a criminal matter, while having surface appeal, will not stand analysis. While the choice between testifying or invoking the Fifth Amendment may be difficult...it does not create a basis for a stay.

857 F. Supp. 1384, 1389 (C.D. Cal. 1994). Even if the Fifth Amendment privilege against self-incrimination was a sufficient basis for a stay, Defendant NAB enjoys no such privilege. *See George Campbell Painting Corp. v. Reid*, 392 U.S. 286, 288 (1968) (maintaining that the constitutional privilege against self-incrimination cannot be utilized by any organization such as a corporation). Additionally, even though Defendant Gardner enjoys a Fifth Amendment privilege, his Fifth Amendment claims "amount to the simple suggestion that [he] should enjoy some advantage in [his] civil case which [he] would not have if there were no criminal investigation pending against [him]." *IBM,* 857 F. Supp. at 1390. Defendant Gardner is entitled to no such advantage. Instead, the Ninth Circuit recognizes that "[a] defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." *Keating*, 45 F.3d at 326.

Additionally, Defendants argue that they will be prejudiced because the prosecutor in the criminal proceedings will gain an advantage from materials unearthed during civil discovery. This concern is of doubtful relevance to the civil proceedings. Discovery ended on July 15, 2006; thus, a stay in the proceedings will not result in a stay in discovery. Even if discovery had not been completed, there is no rule or equitable principle that protects a

1 defendant in a pending criminal prosecution from the disclosure, by another person in a
2 separate civil action, of evidence, which may later become a part of the prosecution's case
3 against him. *United States v. American Radiator & Standard Sanitary Corp.*, 388 F.2d 201,
4 204 (3d Cir. 1969).

5   Furthermore, it is important to note that Defendants will not be burdened by an undue
6 workload if both the civil and criminal proceedings advance in parallel. Because discovery
7 is now complete in the civil proceedings, intensive discovery efforts will not divert resources
8 from the defense of the criminal action. Therefore, the only burden placed on Defendant
9 Gardner is the difficulty of having to choose whether or not he should assert his Fifth
10 Amendment privilege. This burden, however, does not outweigh the other interests favoring
11 denial of the stay request. In sum, only one factor favors Defendant Gardner. The four
12 remaining factors support Plaintiff. On balance, these factors support that Defendants'
13 Motion to Stay Proceedings should be denied.

14   **B.   DEFENDANT GARDNER'S DEPOSITION**

15   The Court must additionally address the termination of Defendant Gardner's
16 deposition on July 12, 2006. Defendants' counsel terminated the deposition after Defendant
17 Gardner was sworn and stated his name. There is nothing in the Federal Rules of Civil
18 Procedure that allows counsel to unilaterally terminate a deposition. Rule 30 of the Federal
19 Rules of Civil Procedure governs counsel's behavior during a deposition. In particular, Rule
20 30(c) states that "[a]ll objections made at the time of the [deposition] examination to the
21 manner of taking it, to the conduct of any party, or to any other aspect of the proceedings
22 shall be noted by the [court reporter] upon the record of the deposition; but the examination
23 shall proceed, with the testimony being taken subject to the objections." Fed. R. Civ. P.
24 30(c).

25   Rule 30(d)(1) further states that "[a]ny objection during a deposition must be stated
26 concisely and in a non-argumentative and non-suggestive manner. A person may instruct a
27 deponent not to answer only when necessary to preserve a privilege, to enforce a limitation
28 directed by the court, or to present a motion under Rule 30(d)(4)." Fed. R. Civ. P. 30(d)(1).

Rule 30(d)(4) "is the only authority allowing the interruption of a deposition." *Perrigon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 460-61 n. 4 (N.D. Cal. 1978). To obtain a protective order under Rule 30(d)(4), the moving party must show that "the examination is being conducted in bad faith or in such a manner as unreasonably to annoy, embarrass, or oppress the witness or party." Fed. R. Civ. P. 30(d)(4).

Here, Defendants' attorney, without making the slightest effort to comply with the appropriate procedures for terminating a deposition under Rule 30(d)(4), took it upon himself to unilaterally terminate the deposition of Defendant Gardner. Because Defendants' counsel did not exercise any of the proper procedures, sanctions are appropriate. Rule 30(d)(3) states that "[i]f the court finds that any impediment, delay, or other conduct has frustrated the fair examination of the deponent, it may impose upon the persons responsible an appropriate sanction, including the reasonable costs and attorney's fees incurred by any parties as a result thereof." Fed. R. Civ. P. 30(d)(3). Therefore, Plaintiff is not responsible for any of his counsel's fees incurred on July 12, 2006. Instead, Defendants are required to pay Plaintiff's counsel's reasonable attorney's fees and costs associated with the deposition.

Accordingly,

**IT IS ORDERED DENYING** Defendants' Motion to Stay Proceedings (Doc. #90).

**IT IS FURTHER ORDERED** that Defendants pay Plaintiff's reasonable attorney's fees and costs incurred in connection with Defendant Gardner's previous deposition.

**IT IS FURTHER ORDERED** that, due to Defendants' counsel's actions in unilaterally terminating a deposition that he could not terminate, the Court will allow Plaintiff five business days from the date of this Order to complete the deposition of Defendant Gardner.

DATED this 3rd day of August, 2006.

James A. Teilborg
United States District Judge